The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: July 16, 2026

**No. A-1-CA-42895**

**RUBEN A. VALERIO, Personal Representative of the ESTATE OF CANDIDO VALERIO, Deceased; CULTURAL ENERGY, a New Mexico non-profit corporation d/b/a KCI RADIO; ROBIN COLLIER; CRUZ VALERIO; DONALD VIGIL; and FRANCELLA VIGIL,**

    Plaintiffs-Appellees,

v.

**CRISTOBAL DE LA SERNA LAND GRANT,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**Emilio Chavez, District Court Judge**

Padilla Law Firm, P.A.
Ernest L. Padilla
Santa Fe, NM

for Appellees Cultural Energy and Robin Collier

New Mexico Legal Aid, Inc.
David Benavides
Victoria Lovato
Albuquerque, NM

for Appellant

Raúl Torrez, Attorney General
Enrique Romero, Assistant Attorney General
Megan Veach, Assistant Attorney General
Ellen Venegas, Senior Solicitor General
Santa Fe, NM

for Amicus Curiae N.M. Department of Justice and
N.M. Land Grant Council

**OPINION**

**WRAY, Judge.**

{1}     The opinion filed on July 16, 2026 is hereby withdrawn and this opinion is substituted in its place, following the Cristobal de la Serna Land Grant's (the Land Grant) motion for rehearing, which this Court denies. This appeal involves a quiet title action against the  Land Grant, and the relationship between NMSA 1978, Section 42-11-1 (1979), which addresses governmental immunity in the real property context, and the Land Grants Act, NMSA 1978, §§ 49-1-1 to -23 (1907, as amended through 2025). Section 42-11-1 grants immunity from suit to "[t]he state of New Mexico and its political subdivisions" for cases "involving a claim of title to or interest in real property except as specifically authorized by law." In 2004, Section 49-1-1 of the Land Grants Act was amended to declare that "[a]ll land grants-mercedes in the state or land grants-mercedes described in Section 49-1-2 . . . shall be managed, controlled and governed by their bylaws, by the Treaty of Guadalupe Hidalgo and as provided in [the Land Grants Act] as political subdivisions of the state." Based on this authority, the Land Grant asserted immunity and sought dismissal of the quiet title claim. The district court denied the motion to dismiss. In this interlocutory appeal, we conclude that the Legislature did not intend for the reference to political subdivisions in Section 49-1-1 to bring land grants-mercedes

within the immunity afforded by Section 42-11-1 and therefore, affirm.

**BACKGROUND**

{2}    In September 2014, Candido Valerio filed suit to quiet title against Cultural Energy and alleged that Cultural Energy had claimed two "Communications Infrastructure Easements" on his property. For the next six years, these two parties engaged in research and negotiations to resolve the dispute. In 2021, Candido Valerio died, and Ruben A. Valerio, as personal representative of the estate (the Estate), replaced Candido Valerio as a party. The parties continued to negotiate until September 2023, when the first amended complaint to quiet title was filed.

{3}    The first amended complaint was brought by the Estate, Cultural Energy, Robin Collier, and several other "[i]nvoluntary [p]laintiffs" against twenty individuals, two deceased persons, the unknown heirs of twenty-six other individuals, and five entities, including the Land Grant. The subject property, the first amended complaint alleged, was located within the boundaries of the Land Grant. Plaintiffs alleged that each individual plaintiff possessed a piece of the subject property, which included communications infrastructure easements that crossed each portion. In 2024, a second amended complaint to quiet title was filed after the "[i]nvoluntary [p]laintiffs" agreed to participate in the action, a survey provided additional information, and further information was discovered about another party. In August 2024, the Land Grant filed the motion to dismiss and argued that it enjoyed

sovereign immunity from quiet title suits based on Section 49-1-1 of the Land Grants Act and Section 42-11-1. The district court denied the motion.

{4}     The Land Grant filed an application for interlocutory appeal in this Court, which we construed as a petition for writ of error under Rule 12-503 NMRA and granted. *See Campos de Sueños, Ltd. v. Cnty. of Bernalillo*, 2001-NMCA-043, ¶ 15, 130 N.M. 563, 28 P.3d 1104 ("[This Court] issue[s] writs of error to review immunity from suit cases because we consider them collateral orders affecting interests that would be irretrievably lost if the case proceeded to trial." (alteration, internal quotation marks, and citation omitted)).

**DISCUSSION**

{5}     The Land Grant argues that (1) it is immune from suit for quiet title actions because the Legislature has designated land grants-mercedes to be "political subdivisions," *see* § 49-1-1; (2) political subdivisions are immune from suits regarding title to property, except as specifically authorized by law, *see* § 42-11-1; and (3) suit for quiet title against a land grant-merced is not specifically authorized by law, *see id.* "Statutory construction is a question of law," which we review de novo. *Rayellen Res., Inc.* (*Rayellen*) *v. N.M. Cultural Properties Rev. Comm.*, 2014-NMSC-006, ¶ 37, 319 P.3d 639. As we explain, we decline to rely solely on the shared language between Sections 49-1-1 and 42-11-1 and conclude that based on the nature of land grants-mercedes, the purpose of the Land Grants Act, as well as

its other provisions, the Legislature did not intend for its 2004 amendment to Section 49-1-1 to extend Section 42-11-1 immunity to land grants-mercedes for suits to quiet title.

{6}     Our purpose in statutory construction is always "to try to determine and give effect to the Legislature's intent." *Rayellen*, 2014-NMSC-037 ¶ 38 (internal quotation marks and citation omitted). To accomplish that endeavor we turn to the relevant statutory language. *See State v. Smith*, 2004-NMSC-032, ¶ 9, 136 N.M. 372, 98 P.3d 1022 ("We begin by looking at the language of the statute itself."). Originally, Section 49-1-1 (1907) stated,

> All grants of land in the state of New Mexico made by the government of Spain or by the government of Mexico, to any community, town or pueblo, or of the class of grants mentioned in [Section 49-1-2], shall be managed, controlled and governed as herein provided.

In 2004, the Legislature amended Section 49-1-1 to read as follows:

> All land grants-mercedes in the state or land grants-mercedes described in Section 49-1-2 . . . shall be managed, controlled and governed by their bylaws, by the Treaty of Guadalupe Hidalgo and as provided in [the Land Grants Act] as political subdivisions of the state.

Separately, Section 42-11-1 grants immunity to "[t]he state of New Mexico and its political subdivisions" for "any suit, action, case or legal proceeding involving a claim of title to or interest in real property except as specifically authorized by law." We disagree with the Land Grant that the plain language of Section 49-1-1 unambiguously "designate[s]" land grants-mercedes as political subdivisions in

every respect. *See Smith*, 2004-NMSC-032, ¶ 9 (recommending "caution in applying the plain meaning rule").

{7}     The text of Section 49-1-1 instructs that land grants "shall be managed, controlled and governed" according to three sources of authority: their bylaws, the Treaty of Guadalupe Hidalgo, and "as provided in Sections 49-1-1 through 49-1-18." The term "as political subdivisions" follows the final source. Thus, the text of Section 49-1-1 directs that land grants-mercedes will be "managed, controlled and governed . . . as political subdivisions." The internal management, control, and governance of a land grant-merced are matters apart from whether a land grant-merced is subject to suit or is to be considered, in all respects, a political subdivision. *Cf. Mondragon v. Tenorio*, 554 F.2d 423, 424, 426 (10th Cir. 1977) (determining that for the purposes of 42 U.S.C. § 1983 land grants-mercedes do not act under color of state law because "the state statute providing for the management of the lands of [a land grant-merced] is limited in scope to such management of the lands and nothing more").

{8}     This view of Section 49-1-1 is in line with the district court's determination and New Mexico law that land grants-mercedes are "a distinct type of political subdivision." Land grants-mercedes are different from other land grants because the land was granted "for the purpose of founding or establishing a community, town, colony or pueblo." Section 49-1-1.1(C); *see Rayellen*, 2014-NMSC-006, ¶ 39

(noting the "unique nature" of the property rights of a community land grant). The Land Grants Act was passed in order to "create a board of trustees" that would "manage their common lands" (the boards). *Rayellen*, 2014-NMSC-006, ¶ 39. For this reason, land grants-mercedes have long been considered to be "quasi-municipal corporations," with both governmental and business characteristics. *See Armijo v. Cebolleta Land Grant*, 1987-NMSC-006, ¶ 5, 105 N.M. 324, 732 P.2d 426 ("[A] community land grant is a quasi-municipal corporation."); *see also* § 49-1-3 (identifying the powers of the boards of trustees to manage and control land grants-mercedes); *Bd. of Trs. of Las Vegas v. Montano*, 1971-NMSC-025, ¶ 16, 82 N.M. 340, 481 P.2d 702 (explaining that the "principal function" of the boards "is to hold title to and manage the common lands of the grant"); *cf. Wilson v. Denver*, 1998-NMSC-016, ¶ 42, 125 N.M. 308, 961 P.2d 153 (considering ditch associations, for constitutional purposes, to "have a nominal public character but remain essentially business enterprises" when the ditch association was identified by one statute as a political subdivision and another as a corporation (internal quotation marks and citation omitted)). Given the dual role of a land grant-merced, we hesitate to assign all of the attributes of a political subdivision to a land grant-merced, based entirely on language shared between disparate statutes and absent other indication that it was the Legislature's intent to do so.

**{9}** Our Supreme Court in *Rayellen* similarly declined to rely solely on "political subdivision" language used in Section 49-1-1 in order to impose one of the burdens of political subdivision status on a land grant-merced. *See Rayellen*, 2014-NMSC-006, ¶¶ 40-41. The issues in *Rayellen* involved a statute that defined "state land" to include "property owned, controlled or operated by a . . . political subdivision of the state." *Id.* ¶ 37 (emphasis, internal quotation marks, and citation omitted). A pueblo argued that the "use of the term 'political subdivision'" in both that statute and Section 49-1-1, "require[d] a conclusion that the Legislature intended that common lands [of a land grant-merced] be considered state land." *Rayellen*, 2014-NMSC-006, ¶ 38. After considering the historical view "that the common lands of a community land grant are jointly held as private property by the heirs of the land grant," the *Rayellen* Court concluded that the shared "political subdivision" language did not "transform these privately held common lands into state land." *Id.* ¶¶ 39, 41. Similarly in the present case, the shared "political subdivision" language alone does not afford land grants-mercedes a blanket immunity. As we have explained, the Land Grants Act itself appears to limit political subdivision status to matters of internal governance and management with no reference to immunity for the land grants-mercedes for property disputes.

**{10}** The Land Grant contends that the district court disregarded the "plain language" of Section 49-1-1, in part based on our Supreme Court's analysis in *Nash*

*v. Board of County Commissioners of Catron County*, 2021-NMSC-005, 480 P.3d 842. To the contrary, the *Nash* Court had no occasion to construe the meaning of one statute to determine whether based on that statute, the Legislature intended for Section 42-11-1 immunity to apply. *Nash*, 2021-NMSC-005, ¶¶ 18-19 (outlining the issues to include the lawful enactment of Section 42-11-1 and any potential "waiver" of governmental immunity); *see Richard v. Marathon Petroleum Corp.*, 2026-NMCA-004, ¶ 33, 584 P.3d 944 ("[C]ases are not considered authority for propositions not considered." (internal quotation marks and citation omitted)), *cert. granted*, 2025-NMCERT-011 (S-1-SC-40983). Indeed, to determine whether quiet title suits were "specifically authorized by law," *see* § 42-11-1, the *Nash* Court focused on the Legislature's intent and acknowledged that "when necessary to determine the intent of the Legislature, [appellate courts] 'also consider the history and background of the statute.'" 2021-NMSC-005, ¶¶ 28-29 (quoting *Smith*, 2004-NMSC-032, ¶ 10). Along these lines, to discern legislative intent, our Supreme Court has directed that we look to "the overall structure of the statute and its function in the comprehensive legislative scheme." *Smith*, 2004-NMSC-032, ¶ 10.

{11}     Other provisions of the Land Grants Act address private property interests in relation to the common lands of land grants-mercedes. The district court cited Section 49-1-11.1, Section 49-1-11.2, and Section 49-1-15. Section 49-1-11.1 states as follows:

A. A person who is not an heir and who has purchased or leased property within the limits of a land grant-merced shall only have a right to the lands acquired through the purchase or lease but not to any common lands within the land grant-merced.

B. The provisions of [the Land Grant Act] shall not diminish, extinguish or otherwise impair any private property interest located within the boundaries of a land grant-merced or be construed to grant the board of trustees of a land grant-merced regulatory authority over such property interests or lands other than the common lands. As used in this subsection, "property interest" includes valid easements and rights of access, but does not include use rights to the common lands of the land grant-merced.

C. The designation of land grants-mercedes as political subdivisions of the state shall not alter the property rights of the heirs in the common lands. The common lands owned or controlled by a land grant-merced shall not be considered to be, designated or treated as state land.

Section 49-1-11.2 states that "[a] land grant-merced managed, controlled and governed as a political subdivision pursuant to [the Land Grants Act] shall not be subject to adverse possession claims to or defenses against the common lands administered by the political subdivision, provided that those claims or defenses have not vested prior to the effective date of this section." Section 49-1-15(A) permits the land grant board to "institute an action of ejectment in district court" in the event that "a person holds in possession or claims in private ownership, within the exterior boundaries of a land grant-merced, any tract, piece or parcel of land to which, in the opinion of the board of trustees, the person has no right or title."

**{12}** These provisions anticipate disputes about title. Despite acknowledging that "[t]he designation of land grants-mercedes as political subdivisions of the state," *see* § 49-1-11.1(C), Section 49-1-11.1 generally preserves certain private property rights and interests of both heirs and non-heirs. Section 49-1-11.2 protects land grants-mercedes from adverse possession claims and defenses brought after a certain date. Section 49-1-15(A) allows land grants-mercedes to bring suit for ejectment under certain circumstances. Each of these provisions acknowledges that multiple parties will have rights to land within the exterior boundaries of a land grant-merced and attempts to align those rights with the unique set of property rights enjoyed by a land grant-merced. *See Rayellen*, 2014-NMSC-006, ¶ 39 ("Our courts have long recognized that the common lands of a community land grant are jointly held as private property by the heirs of the land grant."). As the district court observed, to preserve property rights for heirs and non-heirs but not allow those parties to enforce those rights—when the Land Grants Act explicitly permits the boards to bring claims—creates an absurdity and an injustice. *See Smith*, 2004-NMSC-032, ¶ 10 (rejecting "a formalistic and mechanical statutory construction when the results would be absurd, unreasonable, or contrary to the spirit of the statute"). To prevent such inequity, the Legislature ensured the Land Grants Act—including Section 49-1-1—would not impair private property interests or alter the rights of heirs in the common lands. *See* § 49-1-11.1(B), (C).

{13}     The Land Grant contends that the district court incorrectly concluded that these provisions specifically authorize quiet title suits, as provided in Section 42-11-1, or otherwise waive immunity, and further that no provisions expressly waive immunity, which the Legislature has demonstrated it knows how to do. *See, e.g.*, NMSA 1978, § 42-6-12 (1947) (waiving a specific immunity); NMSA 1978, § 41-4-4(A) (2001) (same); NMSA 1978, § 41-4-11(A) (2019) (same). We need not consider whether any exception applies or whether waiver permits suit. In our view, these other provisions of the Land Grants Act demonstrate that the Legislature did not intend, by including "as political subdivisions" in Section 49-1-1, to afford land grants-mercedes blanket immunity under Section 42-11-1. *See Smith*, 2004-NMSC-032, ¶ 10 (considering the statute as a whole as well as "its function in the comprehensive legislative scheme").

{14}     Considered as a whole, the Land Grant Act contemplates that land grants-mercedes are quasi-municipal entities that manage private property, which may become involved in private property disputes. The purpose of the Land Grants Act is to create a board of trustees to manage the common lands, and the "principal function of the board of trustees is to hold title to and manage the common lands of the grant." *See Rayellen*, 2014-NMSC-006, ¶ 39 (alteration, internal quotation marks, and citation omitted). Our courts have viewed land grants-mercedes as quasi-municipal corporations, *see Armijo*, 1987-NMSC-006, ¶ 5, and generally, immunity

for quasi-municipal corporations depends on the particular function being performed, *see Gallagher v. Albuquerque Metro. Arroyo Flood Control Auth.*, 1977-NMCA-029, ¶¶ 10-13, 90 N.M. 309, 563 P.2d 103 (determining that immunity for quasi-municipal corporations "depends on whether its activity was governmental or proprietary"). The common lands managed by the boards "are jointly held as private property by the heirs of the land grant," *Rayellen*, 2014-NMSC-006, ¶ 39, and the purpose of a quiet title action is "to determine and quiet the title of real property . . . against any person or persons, claiming title thereto, or parcel or portion thereof," *see* NMSA 1978, § 42-6-1 (1945). Thus, any quiet title action involving the common lands of a land grant-merced does not involve a governmental function but instead is a private property dispute. *Cf. Nash*, 2021-NMSC-005, ¶¶ 35-37 (noting that the remedy against the government when property is "taken or injured" is an inverse condemnation proceeding). And, as we have explained, title disputes are anticipated by the Land Grants Act. In this way, the nature of the property interest and a quiet title suit further suggests that the scheme of the Land Grants Act as a whole did not contemplate immunity from suit for quiet title actions.

{15} Our Supreme Court has noted that "[w]ithin limits, it is clear that the Legislature may statutorily impose sovereign immunity." *Nash*, 2021-NMSC-005, ¶ 23. Our role is to resolve whether the current quiet title action falls within scope of the immunity created by Section 42-11-1. *Cf. Nash*, 2021-NMSC-005, ¶ 23

(considering whether a quiet title action fell within "the scope of the immunity created by Section 42-11-1" and a separate statutory waiver of immunity). While Section 42-11-1 grants immunity to "political subdivisions" from suit to quiet title, Section 49-1-1 does not declare that land grants-mercedes are political subdivisions in all respects and instead directs that land grants-mercedes should be "managed, controlled and governed . . . as political subdivisions." Considering the language and purpose of the Land Grants Act, as well as the nature of land grants-mercedes and common lands, we conclude that the Legislature did not intend to provide blanket immunity to land grants-mercedes for quiet title actions.

**CONCLUSION**

{16}   We affirm.

{17}   **IT IS SO ORDERED.**


_____
**KATHERINE A. WRAY, Judge**

**WE CONCUR:**


_____
**JENNIFER L. ATTREP, Judge**


_____
**SHAMMARA H. HENDERSON, Judge**